**UNITED STATES of America,
Plaintiff,**

**v.**

**Allen R. DAVISON, Defendant.**

**Case No. 08–0120–CV–W–GAF.**

United States District Court,
W.D. Missouri,
Western Division.

Dec. 18, 2009.

See also 2010 WL 286419.

Allyson B. Baker, Gregory S. Seador, Daniel A. Applegate, Dorotha M. Ocker, Department of Justice, Washington, DC, Charles M. Thomas, Office of the United States Attorney, Kansas City, MO, for Plaintiff.

Allen R. Davison, Overland Park, KS, pro se.

## ORDER

GARY A. FENNER, District Judge.

Presently before the Court are Plaintiff United States of America's (the "Government") Motion for Summary Judgment

(Doc. # 45) and Defendant Allen R. Davison's ("Davison") Motion for Summary Judgment, both filed pursuant to Fed. R.Civ.P. 56. (Doc. # 44). The Government seeks summary judgment and the issuance of a permanent injunction against Davison, arguing Davison has promoted "extensive tax-fraud schemes for more than ten years." (Doc. # 46). Davison seeks summary judgment against the Government, alleging he did not promote tax-fraud schemes and, as a matter of law, no injunction should issue. (Doc. # 44). For the reasons set forth below, both Davison and the Government's Motions for Summary Judgment are **DENIED.**

## *DISCUSSION*

### I. FACTS

Davison is a certified public accountant, with licenses in Kansas, Missouri, and Nebraska. (Complaint, ¶ 8). He is also an attorney, licensed in the State of Nebraska. *Id.* In 1993, Davison became a tax partner of the Grant Thornton accounting firm and went to work in its Kansas City office. *Id.* at ¶ 10. In October of 2001, Davison left Grant Thornton. *Id.* at ¶ 11. Many of the Government's allegations of abusive tax arrangements stem from Davison's employment with Grant Thornton. (Doc. # 46, p. 5). After leaving Grant Thornton, Davison has worked as a tax consultant with BI Services of America, which is bookkeeping concern that prepares tax returns for customers based in Kansas City, Missouri, and Cheryl Womack, a Kansas City businesswoman. (Complaint, ¶ 13).

According to the Government, the Internal Revenue Service (the "IRS") has been investigating Davison since 2003 for alleged "abusive tax arrangements." (Doc. # 46). The Government argues Davison has promoted the following abusive tax arrangements: (A) sham management companies and parallel C corporations;

(B) sham employee stock ownership plans ("ESOPs"); (C) Roth Individual Retirement Account ("Roth IRA") sham management companies; (D) sham 412(i) arrangements; (E) sham chicken farmer deductions; (F) improperly inflating basis of properties; (G) improper deductions for use of a company called Handicapped Assistance Business Directory ("HABD"); and (H) sham tool program deductions. (Complaint; Doc. # 46, pg. 9–36). The Government also alleged Davison failed to properly file Form 8264 with the IRS to registered him as a material tax advisor to those transactions that were the same or substantially the same as a transaction officially determined by the IRS to be an abusive tax arrangement. (Doc. # 46, p. 37).

Davison has moved for summary judgment on all of the allegations mentioned above. (Doc. # 44). Additionally, Davison seeks summary judgment on First Amendment grounds. *Id.* at p. 17.

### A. MANAGEMENT AND PARALLEL C CORPORATIONS

The Government alleges that beginning in 1999, Davison, along with other associates, began advising business clients to establish sham management companies for the purpose of claiming tax deductions and that these clients regularly took such deductions without following the requisite corporate formalities necessary to maintain their purported management companies. (Doc. # 46, pg. 10–11). Davison owned a thirty (30) percent interest in a company called NMN Corporate Services ("NMN"); NMN helped Davison's clients, as well as others, incorporate companies such as the management companies at issue. *Id.* at p. 10. The Government asserts that while one of Davison's associates may have been primarily responsible for establishing management companies for

clients, they did so at Davison's direction. (Doc. # 46, p. 10; Complaint, ¶¶ 18–31; July 24, 2009, Decl. of Revenue Agent Renato Quiason ("Quiason"), ¶¶ 19–24).

Davison does not deny he promoted the use of various corporate entities to gain favorable tax treatment. However, Davison denies, for the most part, personally counseling clients on the specifics of creating and maintaining such management or operating corporations. (Davison Depo. 163:7–20). Davison maintains he was not responsible for ensuring clients followed the requisite corporate formalities or kept proper books. (Defendant's Answers to Interrogatories, p. 16).

**B. ESOPs**

The Government also alleges Davison promoted abusive tax shelters involving ESOPs. IRS Agent James Ley ("Ley") explained these arrangements generally consisted of the creation of some form of management company, such as a C or S corporation, who's corporate stock was wholly owned by an ESOP and an operating company, which was owned by Davison's alleged customers. (Decl. of Ley, ¶¶ 84–85). The only participant/employee in the ESOP would be the shareholder(s) of the operating company (i.e., Davison's alleged customers). *Id.* at ¶ 86. The management company and the operating company then entered into an agreement calling for payments from the operating company to the management company in exchange for management services. *Id.* at ¶ 87. The operating company would then claim on its taxes that economic performance of the management services would occur within eight and a half (8 ½) months after the close of the operating company's taxable year end. *Id.* at 88. This pur-

portedly allowed the operating company to take an election under I.R.C. § 461(h)(3) to treat the accrual as incurred and deductible in December of the operating company's taxable year one. *Id.* The management company would then claim it incurred expenses, such as payroll or accounting, to offset its management fee income. *Id.*

The Government alleges, however, that the operating company continued to incur and pay those expenses, thus, allowing the ESOP participants/employees to avoid paying all taxes on the management company profits until distribution at retirement. *Id.* at 88, 90. Further, it alleges this type of transaction is the same or substantially similar to the transactions described in Internal Revenue Ruling 2003–6, which made certain abusive ESOP arrangements listed transactions.[1] Internal Revenue Ruling 2003–6 was published on January 21, 2003. While the Government alleges some of these ESOP arrangements by Davison's customers continued through the 2005 tax year, it is unclear exactly when Davison actually promoted these arrangements. (Doc. # 46, pg. 10–11; Decl. of Ley, ¶¶ 92–105).

**C. ROTH IRA MANAGEMENT COMPANIES**

Davison also promoted a multiple entity arrangement consisting of an operating company owned by Davison's clients and a separate management company, incorporated as a C corporation, that was wholly owned by a Roth IRA. (Decl. of Ley, ¶¶ 106–115). Like the ESOPs, Davison's alleged customers also owned the Roth IRAs. *Id.* In these arrangements, the management company would distribute

---

1. 26 C.F.R. § 301.6111–2 explains that a "listed transaction" is a "transaction [that] is the same or substantially similar to one of the types of transactions that the [IRS] has deter-

mined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction."

portions of its purported income from management fees as dividends to the company's sole shareholder, the Roth IRA, where it would accrue as tax-free income. *Id.* The Government alleges that most of these transactions constituted abusive tax shelters because the management companies did not comply with the necessary corporate formalities and did not provide any actual services to the respective operating companies. (Doc. # 46, pg. 20). In support of its allegations, the Government submitted evidence demonstrating Davison signed a 2000 corporate income tax return for John Cimpl's company, which had engaged in such an arrangement. (Decl. of Tax Specialist Michelle Panshke ("Panshke"), ¶¶ 7–14). However, after 2000, Ruth Donovan ("Donovan"), a tax preparer with ties to Davison, began signing John Cimpl's tax returns. *Id.* at ¶ 9. On January 26, 2004, the IRS published Notice 2004–8, which makes abusive Roth IRA arrangements listed transactions.

## D. 412(i) ARRANGEMENTS

Davison is also accused of promoting abusive Section 412(i) arrangements. Revenue Agent Lindsay Carlson explains:

> A section 412(i) plan is a tax-qualified retirement plan funded entirely by a life insurance contract or annuity. The employer claims a tax deduction for contributions that the plan uses to buy premiums on an insurance contract covering an employee. In general, life insurance policies and annuities may be used to fund retirement benefits for a company's highly compensated *and* rank and file employees. In abusive situations ... highly compensated employees have excessive amounts of life insurance coverage on themselves and no coverage of the rank and file employees. The intended result in such an abusive plan is to receive a tax benefit of premium deductions, with an exit strategy out of the plan within five years. After five years,

the insurance policy is purchased or distributed to highly compensated individuals at a suppressed cash value. In later years the cash value increases significantly (known as "spring") in comparison to the suppressed cash value, and the owner of the insurance policy (now the highly compensated individual) borrows all of the cash value of the insurance policy, tax free ... No tax is paid on this amount because the money borrowed against the insurance policy is a "loan." The "borrowed" amount is taken out against the cash value and, in turn, reduces the death benefits.

(Decl. of Revenue Agent Lindsay Carlson ("Carlson"), ¶ 34). The Government asserts Davison promoted an abusive form of 412(i) arrangements to at least two customers, Morgan Diversified and Hickory Crest. *Id.* at ¶¶ 34–36. On March 8, 2004, the IRS published Revenue Ruling 2004–20, which prohibited abusive 412(i) arrangements.

Davison asserts he never promoted § 412 arrangements, but rather introduced clients to Hartford Life Insurance who offered such plans to his clients. (Defendant's Response to Interrogatories, Answer 7(70); Decl. of Carlson, ¶ 33).

## E. CHICKEN FARM DEDUCTIONS

Davison is involved in the production of eggs and has promoted the use of chicken flock contracts. (Doc. # 50, p. 17; Davison Depo., 243:3–9). Generally, these arrangements start with the creation of a business entity, usually a Limited Liability Company ("LLC"), for a client. (Decl. of Ley, ¶ 156). Davison explains that the LLC would then purchase equity ownership of approximately one hundred thirty-five thousand dollars ($135,000) worth of laying hens. (Doc. # 50, p. 17; Davison Depo. 256:9–20). The LLC would then receive contractual payments from a chick-

en egg farming operation for the use of the hens for a specific period of time, generally twelve (12) months. (Doc. # 50, p. 17; Davison Depo. 243:15–16). Davison believes the client, through the LLC, which is taxed in a pass-through partnership manner, may expense the chickens on a cash method of accounting, so that, depending on the timing of the purchase, there could be a delay from one year to the next in the recognition of taxable income. (Davison Depo., 243:1–24). In this way, if the transaction is repeated from year to year, it may be possible for an individual to reduce his or her personal income tax so long as each subsequent year's flock contract payment is more than the payments received from the previous year's flock contract. (Decl. of Ley, ¶ 158).

The Government argues that such deductions are impermissible because Davison's clients are not farmers within the meaning of I.R.C. § 464[2], which means they may not engage is such arrangements, and the flock contracts at issue are, in effect, merely loans subject to normal taxation. Id. at ¶ 156, 159; Davison Depo., 256:9–260:11.

## F. INFLATED BASIS IN PROPERTY

The Government argues Davison advised his clients to fraudulently increase the basis of stock owned by them to reflect contingent liabilities from the sale of the stock. (Doc. # 31, p. 31; Decl. of Revenue Agent Richard Troester ("Troester"), ¶¶ 8–17, 74–76). For instance, in 2002, an alleged Davison client, Tom Lauerman ("Lauerman"), owned an almost fifty (50) percent interest in a health technology company that was sold to a larger healthcare entity. (Decl. of Troester, ¶ 10). In that sale, he received approximately twenty-four million dollars ($24,000,000) upon the purchase of his stock. Id. Dovovan, allegedly under Davison's direction, counseled Lauerman that he could reduce his tax liability from this sale by increasing his basis in the stock by more than nine million seven hundred thousand dollars ($9,700,000) because a provision in the stock sale agreement constituted a contingent liability sufficient to increase the basis. Id. at ¶¶ 11–12. The Government argues that there was no authority to support such an increase. Id.

Davison believes that there was substantial authority in support of this position and has offered a substantial authority opinion letter, drafted either by him or at his direction and dated December 15, 2002, in support of this position. (Davison Depo., 105:16–106:10; Defendant's Answers to Interrogatories, pg. 43–44).

## G. HABD

In 2002, Davison and Doug Bethell formed the corporation HABD. (Davison Depo., 224:21–24). HABD provided disabled persons access to phone services using voice recognition technology and verbal response cues. Id. at 225:1–15; Defendant's Answers to Interrogatories, p. 49. Businesses, including some of Davison's clients, could pay a fee to HABD to use these services, and it was Davison's belief that by doing so these businesses could claim the disabled access credit under I.R.C. § 44. (Defendant's Answers to Interrogatories, p. 49). In December of 2003, HABD ceased offering its services. (Davison Depo., 232:5–9). Davison explained that HABD did so because in March of 2003, a chief counsel memorandum was created that indicated the IRS did not believe these types of phone systems qualified for the § 44 credit because

---

**2.** I.R.C. § 464(e)(1)(2009) states, in relevant part, "farming" means "the cultivation of land or the raising or harvesting of any agri-cultural or horticultural commodity including the raising, shearing, feeding, caring for, training, and management of animals."

they were not required by the Americans with Disabilities Act. *Id.* at 232:11–24.

The Government argues Davison purposefully promoted the use of HABD as a fraudulent method for claiming tax credits. (Doc. # 46, p. 32). It further alleges that such fraudulently procured tax credits cost the Government more than one hundred and ten thousand dollars ($110,000). *Id.;* Decl. of Revenue Agent Janice Mallon ("Mallon"), ¶ 16.

## H. TOOL PROGRAM DEDUCTIONS

The Government alleges Davison promoted a sham tool reimbursement program that has cause the Government to loose more than an estimated fifteen million dollars ($15,000,000) in tax revenue. (Decl. of Mallon, ¶ 17). The arrangement involves the accountable plan rules of I.R.C. § 62, which apply to automotive service technicians and certain other tradespeople that are required to provide their own tools for their work. *Id.* at ¶ 52. In general, these tool reimbursement programs allow portions of a technician's compensation to be characterized as reimbursement for tool expenses rather than taxable wages. To participate in such an arrangement, however, employees must substantiate expenses for tools covered by the arrangement to their employers and employers must not provide employees the right to retain amounts in excess of substantiated tool expenses. I.R.C. § 62(c)(2009). The Government alleges Davison, through a company called Cash Management Systems ("CMS"), authored four authoritative memorandums or opinions in favor of such tool plans and that CMS clients have used the tool reimbursement program in an abusive and fraudulent manner. (Decl. of Mallon, ¶¶ 52–54).

## I. FAILURE TO FILE FORM 8264

Under I.R.C. § 6111, prior to October 31, 2007, any material tax advisor to a listed transaction was required to file Form 8264 with the IRS setting forth certain details of the transaction. The Government argues Davison should have filed a Form 8264 for each of the arrangements discussed above. (Decl. of Mallon, ¶¶ 43–50).

Davison maintains he has not prepared any tax returns for clients since 2001. (Defendant's Answers to Interrogatories, p. 55). He further maintains, prior to October 22, 2004, he was never a material advisor involved in the promotion of any tax shelter that was subject to registration. *Id.*

## J. DAVISON'S FIRST AMENDMENT CLAIM

Davison argues he is entitled to summary judgment on First Amendment grounds. More specifically, he argues that the issuance of an I.R.C. § 7408 injunction would violate his First Amendment right to freedom of speech. (Doc. # 44, p. 17).

## II. LEGAL STANDARDS

Fed.R.Civ.P. 56 addresses motions for summary judgment. Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On summary judgment, a district court must view the facts "in the light most favorable to the nonmovant, giving it the benefit of all reasonable inferences to be draw from the facts." *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990).

In this action, the Government is seeking injunctive relief under 26 U.S.C. (I.R.C.) § 7408. To obtain relief in a statutory-injunction action such as this, a plaintiff must demonstrate that the defendant

has violated a statute and that a reasonable likelihood of future violations exists. *United States v. Shafer*, No. 05–5010–CV–SW–GAF, 2005 WL 1324851, at *1 (W.D.Mo.2005) (citing *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir.1990)). Under § 7408, a district court may enjoin a person from engaging in conduct subject to penalty under 26 U.S.C. (I.R.C.) §§ 6700, 6701, 6707, or 6708 if (1) the person is found to have engaged in such conduct; and (2) the court finds injunctive relief is appropriate to prevent recurrence of such conduct.

The Government argues Davison has engaged in conduct subject to penalty under §§ 6700 or 6707(a). Section 6700 imposes a penalty upon any person who: (1) "organizes (or assists in the organization of)" any plan or arrangement, or (2) "participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement" and "makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)—(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or (B) a gross valuation overstatement as to any material matter." Section 6707(a) imposes a penalty upon any person who is required to file a return under § 6111(a) but either fails to do so or files false or incomplete information.

From 1991 until 2008, a tax return preparer would only be subject to penalty for understating a client's taxable income due to an unrealistic position if a reasonably well informed person in tax law would have believed the position had an approximately greater than two in three chance of being overturned on its merits if litigated in tax court. *See* 56 Fed. Reg. 67509–01, 67516 (1991). The relevant regulation called this the "realistic possibility" or "substantial authority" standard explaining that a position is "considered to have a realistic possibility of being sustained on its merits if a reasonable and well-informed analysis by a person knowledgeable in the tax law would lead such a person to conclude that the position has approximately a one in three or greater likelihood of being sustained on its merits." *Id.* This standard applies to most of Davison's conduct in the present action.

In 2008, the IRS issued new regulations that heightened this standard. *See* Treas. Reg. § 1.6694–2(b) (2009). Under this new standard, to be free from penalty, it must be "reasonable [for a tax return preparer acting in good faith] to believe that a position would more likely than not be sustained on its merits," thus a tax return preparer must now have a reasonable, subjective good faith belief that a tax position has a greater than fifty percent (50%) chance of success if litigated *Id.*

■ Unlike the current standard, the realistic possibility standard "is objective, and is not affected by the [tax return preparer's] subjective belief in the correctness of his position." *United States v. Kapp*, 564 F.3d 1103, 1109 (9th Cir.2009). The Government "bears the burden of proving each element for enjoining a tax preparer by a preponderance of the evidence." *Id.*

### III. ANALYSIS

■ Viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences from those facts, there remains numerous material questions of fact. For instance, regarding the Government's claim that Davison promoted the fraudulent use of sham business entities, including the use of

ESOP, Roth IRA, and 412(i) arrangements, issues of fact remain as to: (1) the extent of Davison's involvement with his alleged clients, including any responsibility he may have had for ensuring that all formal requirements for corporate formation and continuation were met; (2) whether Davison continued to promote arrangements that were determined to be listed transactions under Rev. Rul. 2003–6, IRS Notice 2004–8, or Rev. Rul. 2004–20; and (3) whether, prior to formal publication of such listed transactions, a "reasonable and well-informed analysis by a person knowledgeable in the tax law would [have led] such a person to conclude that th[ose] position[s] had approximately a one in three or greater likelihood of being sustained on [their] merit[ ]." *See* 56 Fed. Reg. 67509–01, 67516.

■ Further, material facts remain as to whether Davison's use of flock contracts is a legitimate method for delaying the recognition of taxable income from year to year. For instance, regarding all such transactions promoted prior to 2008, it remains to be seen whether a reasonable person skilled in tax law would believe the use of flock contracts in such a manner would have had a greater than one in three chance of being sustained in a tax ligation.

■ Additionally, there is a material issue of fact remaining regarding the Government's allegations of Davison improperly inflating clients' basis in property, namely, whether Davison had a reasonable or substantial grounds for making those adjustments to basis. Davison has submitted evidence he purports establishes such grounds.

■ Similarly, questions of material fact remain as to whether Davison's promotion of HABD should be deemed abusive or fraudulent. First, the question of whether a reasonable person knowledgeable in tax law would have believed, at the time Davison promoted such arrangements, the ar-

rangements had a one in three chance of success on the merits if litigated in tax court remains unanswered. Second, there is a factual question of whether an injunction is necessary to stop Davison from promoting such an arrangement in the future because Davison presented evidence that HABD had ceased operations and he had stopped promoting such arrangements in December of 2003.

■ Regarding the tool reimbursement programs, material issues of fact exist as to whether Davison promoted such programs in an abusive or fraudulent manner. I.R.C. § 62(a)(2) does allow for certain reimbursement arrangements. The question is whether Davison promoted some abusive or fraudulent form of such arrangement. The evidence presented does not sufficiently resolve this issue. Two inference might be drawn from the facts at this point. First, Davison knew and intended CMS to promote the use of tool programs where employers participating in the program allowed deductions for employees regardless of whether any employee ever substantiated the expense of tools and employers were encouraged to allow employees the right to retain amounts in excess of substantiated covered expenses. Second, Davison offered basic, broad-stroke advice to CMS regarding how such reimbursement plans should be implemented in accordance with § 62(a)(2) and (c), but employers failed to take all necessary steps to lawfully implement the programs or kept poor records relating to the plans.

■ Material issues of fact also remain as to Davison's failure to file a Form 8264. This issue is complex because its solution requires a factual determination of whether: (1) at the time Davison was promoting them, the above-mentioned arrangements lacked substantial authority and were, thus, abusive; and (2) the extent and nature of Davison's interactions with clients

the Government claims engaged in abusive or fraudulent tax practices to determine whether Davison was a "material advisor," as that term is defined under tax law, to those various arrangements. Based on the facts presented, the Court cannot resolve those questions.

 Lastly, Davison is not entitled to summary judgment on First Amendment freedom of speech grounds. It is well settle that "[t]he First Amendment does not protect commercial speech about unlawful activities." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497, n. 7, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). Thus, if it is ultimately determined that some or all of the arrangements detailed above constitute unlawful activities or that Davison's speech relating thereto was fraudulent or misleading, the First Amendment will offer Davison no refuge. Given the issues of fact remaining in this case, the Court is presently unable to fully determine the lawfulness of the arrangements detailed above.

### CONCLUSION

As stated above, numerous genuine issues of fact remain in this case. These issues must be resolved before either party is entitled to judgment as a matter of law. Therefore, both Davison and the Government's Motions for Summary Judgment are **DENIED.**

**IT IS SO ORDERED.**